UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR15-259 MJP |
| Plaintiff, | ORDER ON FRANKS MOTION |
| v. | AND MOTION TO SUPPRESS WIRETAP EVIDENCE |
| RAMON ZAVALA-ZAZUETA, et al., | |
| Defendants. | |

The Court, having received and reviewed:

1.  Defendant Zavala-Zazueta's Motion to Suppress Evidence Obtained by Unlawful
    Interception of Cellular Telephone Communications (Dkt. No. 364)

2.  Defendant Zavala-Zazueta's Motion for a Franks Hearing (Dkt. No. 366)

3.  Government's Opposition to Defendant Zavala-Zazueta's Motions to Suppress
    Wiretap Evidence and for a *Franks* Hearing (Dkt. No. 391)

4.  Defendant Zavala-Zazueta's Reply to Government's Opposition to Defendant Zavala-
    Zazueta's Motions to Suppress Wiretap Evidence and for a *Franks* Hearing (Dkt. No.
    443)

5.  Government's Supplemental Memorandum Regarding Standard of Review (Dkt. No. 471)

6.  Defendant Zavala-Zazueta's Supplement Regarding *Franks* and Suppression Motion Hearings (Dkt. No. 473)

and all attached declarations and exhibits, and having heard testimony and oral argument, makes the following ruling:

IT IS ORDERED that the <u>Franks</u> motion is DENIED.

IT IS FURTHER ORDERED that the motion to suppress is DENIED.

## **Background**

The origins of this case are found in an investigation into the Asevez-Santillano drug trafficking organization (DTO) which began in December 2013, an investigation which relied on confidential informants, undercover infiltration, video surveillance, pen registers, trap and traces, controlled buys, wiretaps and GPS cell phone tracking, as well as wiretaps.

The investigation went on for over two years without Defendant Ramon Zavala-Zazueta (Zavala-Zazueta) being identified as a person involved in the DTO. Then, on March 3, 2015, a wiretap on Eduardo Guzman-Valenzuela's phone ("Eduardo") picked up a call placed to Zavala-Zazueta (who was unknown to the investigators at the time). Although the affidavit for the wiretap contained a summary of the conversation (found at Ex. 9, Ex. C, Huntington Affidavit, ¶ 26)(hereinafter "Affidavit"), a transcript of the entire conversation is reproduced here for reasons which will become apparent later on in the Court's analysis.

["UM" stands for "Unidentified Male" – it was only later that the investigators figured out that the speaker was Zavala-Zazueta, but the defense does not contest that it was Defendant Zavala-Zazueta on the other end of the call.]

1   EDUARDO: This is LALO.
    UM: Who would like to speak with.
    EDUARDO: Huh?
2   UM: Who would you like to talk to?
    EDUARDO: They just got to the shop to give me your phone number.
3   UM: Oh man, I am the one who used to take care of you before.  Do you remember?
    EDUARDO: Huh?
4   UM: The one with the grey car remember? The one with the grey car.
    EDUARDO: Yes, yes.
    UM: What's up man?
5   EDUARDO: What's up. No, nothing, nothing.
    UM: Well, here I am for anything you need you know. We had lost track of you.
6   EDUARDO: I cannot hear anything. What?
    UM: I am saying that I'm here if you need anything, since I had lost track of you and I that's why I went to
    your brother. To check what's the deal, what can we do.  To see if we can work.
7   EDUARDO: Ah! oh! yes, yes. Just that not in the shop.  The shop is not my brother's. The old man can
    get scared.
8   UM: Alright.  No I just went to give your brother the phone number. Because I didn't have any other way to
    contact you. I just went to give my phone number. Since I go there all the time. I gave the phone number
    to your brother. And then I just left. That's all I had to do.
9   EDUARDO: What are you doing now?
    UM: What?
10  EDUARDO: What are you doing now?
    UM: I'm by myself here man, I even went to your house but they told me that you went to Mexico.
11  EDUARDO: No [U/I]. I was about to tell you, so... at what time can we meet? That place, that same place,
    in the, in the, the camp.
    UM: Yes. Let's meet there.  Let's meet around...give me an hour and a half.  What do you think?
12  EDUARDO: Okay, I'll send you a message.
    UM: Or just come over now. I just stop what I have to do and I go there and meet you.
13  EDUARDO: Alright then.
    UM: In how long should I meet you there?
    EDUARDO: In about half an hour.
14  UM: Alright then. I'll see you there in half an hour.
    EDUARDO: Alright then.
    UM: Okay.
15  Transcript by: Erios 3/17/15

16  (Ex. 10, p. 3.)

17          Four days later, Eduardo again called the UM later identified as Zavala-Zazueta.  Again,

18  the transcript of the entire call is reproduced below.

19

20

21

22

23

24

ORDER ON FRANKS MOTION AND MOTION
TO SUPPRESS WIRETAP EVIDENCE- 3

1   UM: Hello.
    EDUARDO: What's up?
2   UM: What's up? What's up?
    EDUARDO: How you doing?
    UM: I'm good you know.
3   EDUARDO: You never called me back.
    UM: Huh?
4   EDUARDO: You never called me back.
    UM: Oh! man, I really didn't even know this number was.  And I was  thinking who 's calling me, who's
    calling me. [U/I] know how I saved it.  I saved it as the shop. And I was asking myself who was the shop,
5   the shop, the shop.  Since you told me "the one from the shop".
    EDUARDO: Yes.
6   UM: No man, we are going to do that movement tomorrow. We are going to do that for sure.  The guy
    already told me that he was, that he was already arriving. For sure tomorrow.
    EDUARDO: What what what?
7   UM: Tomorrow for sure. For the , for the [U/I]. For the chocolates that you want.
    EDUARDO: Oh! yes, yes. Tomorrow then.
8   UM: Tomorrow for sure.
    EDUARDO: Oh okay.
    UM: It's coming but the low ones. I don't know if your buddies want to try it, you know.
9   EDUARDO: Yes. No, that's the good one. Tomorrow then?
    UM: Alright tomorrow. I'll let you know tomorrow when we are ready. Okay?
10  EDUARDO: Alright man.
    UM: Good. Alright man.
    EDUARDO:Okay.
11  Transcrpit by: Erios  3/17/18

12

13  (Ex. 10, p. 7.)

14      Between March 7 and 14, 2015, a number of other calls and texts were intercepted

15  between Eduardo and Zavala-Zazueta (unsuccessful calls where the other party did not answer,

16  plus 14 texts), suggesting that the two were trying to get together.  The defense points out that

17  there is no confirmation (via surveillance or wiretap) that a meeting ever occurred.

18      On March 11, Zavala-Zazueta was seen with Sendhy Felix-Aceves (Sendhy), niece of

19  Jesus Aceves-Santillano (a member of the DTO).  After intercepting a call indicating that Sendhy

20  was picking up some drugs for Jesus, Sendhy was surveilled and observed being driven around

21  (not by Zavala-Zazueta) to several locations, at one of which an exchange of money was

22  observed.  Apparently the investigators lost track of Sendhy, but when they picked up her trail

23  again, she was seen leaving Zavala-Zazueta's car and entering another vehicle.  Sendhy was not

24

1    observed carrying any packages moving from Zavala-Zazueta's car to the other car.  Zavala-

2    Zazueta and Sendhy were texting throughout the day, but the content of those texts was never

3    recovered.

4         The defense notes that the investigation obtained 32 pen register and trap & trace

5    warrants for various individuals, but never one for Zavala-Zazueta.  Video surveillance of his

6    residence was rejected as not feasible to install.  A GPS cellular tracking warrant was issued for

7    Zavala-Zazueta's phone but was used to trace Zavala-Zazueta's movements only infrequently.

8         On May 15, 2015 a wiretap application was sought and issued by Honorable James L.

9    Robart of this district for Zavala-Zazueta's phone.

10                              **Analysis**

11   **Standard of review**

12        This Court believes that it has the authority to review the findings of necessity and

13   probable cause made by another District Court judge in connection with the issuance of a search

14   warrant.  Although there is no Ninth Circuit precedent directly on point, the weight of authority

15   seems to favor this Court employing the same standard of review as the Court of Appeals would

16   apply.  That standard can be found in U.S. v. Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001):

17          We review de novo whether a full and complete statement of the facts was submitted in
            compliance with U.S.C. 2518(1)(c). [*citation omitted*]  If a full and complete statement
18          was submitted, we review the issuing judge's decision that the wiretap was necessary for
            an abuse of discretion.
19
     This Court is further persuaded by the language in U.S. v. Ayala, 2007 WL 4321713 (D.Haw.
20
     Dec. 11, 2007):
21
            The issuing judge's decision that the wiretap was necessary is factual in nature and is
22          reviewed for abuse of discretion.  Thus, the reviewing court gives deference to the issuing
            judge's finding that the wiretap was necessary to achieve the goals of the investigation.
23          The same standard applies to any reviewing court, including a district court.

24   Id. at *8.

ORDER ON FRANKS MOTION AND MOTION
TO SUPPRESS WIRETAP EVIDENCE- 5

**Franks motion**

A Franks hearing seeks to establish "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." U.S. v. Franks, 438 U.S. 154, 155-56 (1978).  It is a two-prong test, requiring a substantial showing of both (1) actual falsity which was deliberate or the result of "a reckless disregard for the truth" (U.S. v. Prime, 432 F.3d 1147, 1150 n.1 (9th Cir. 2005)) and (2) materiality (U.S. v. Chavez-Miranda, 306 F.3d 973, 979 (9th Cir. 2002).

"An omission or misstatement is material when it relates to the ability of customary investigative tools to produce evidence and would undermine the government's ability to prove the need for the wiretap. *See* [U.S. v.] Gonzalez, 412 F.3d at 1111." (Franks Mtn, p. 5.)  If the Court determines that "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown…" the wiretap should be suppressed. U.S. v. Ippolito, 774 F.2d 1482, 1487 (9th Cir. 1985).

The defense argues that "a showing of necessity must include 'specific circumstances' that render investigative techniques ineffective *against each person* for whom a wiretap is sought." (Franks Mtn, p. 6, *citing* Ippolito, 774 F.2d at 1486)(emphasis supplied.)  In fact, that is not what Ippolito says.   In discussing the necessity for specificity in the affidavit, the Ninth Circuit said:

> [W]e must be careful not to permit the government merely to characterize a case as a drug conspiracy" . . . that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.  United States v. Robinson, 225 U.S. App. D.C. 282, 698 F.2d 448, 453 (D.C. Cir. 1983) (per curiam) (emphasis in original).

1   Ippolito, 774 F.2d at 1486.  The distinction between "necessity" in the context of the scope of the

2   investigation and in the context of the investigation of a particular individual is critical to grasp

3   in the analysis of both of these motions, and will be discussed more fully in the section analyzing

4   Defendant's motion to suppress.

5          Finally, Defendant contends that the affidavit falsely implies that certain techniques were

6   applied in Zavala-Zazueta's investigation, but in actuality were never utilized against Zavala-

7   Zazueta, only others members of the DTO.

8          Defendant alleges the following items in the affidavit to be material and misleading:

9       1.  Pen register/trap and trace

10  The affidavit states:

11          [I]nvestigators have reviewed telephone records for wire and electronic communications
            (court ordered data and subpoenaed toll records) for TT-6 [Zavala-Zazueta's phone].

12          and

13
            [I]nvestigators obtained court authorization for a pen register and trap and trace devices
14          for several phones since my last affidavit… [W]e will continue to use [pen, trap and trace
            devices] when we can, and to the extent they provide useful information we will use that
15          information.

16  (Ex. 9, Ex. C, ¶¶ 41, 54, 55.)  Defendant points out that, although 32 pen register and trap and

17  trace warrants were issued, none were issued for Zavala-Zazueta.  On this basis, he alleges the

18  statements misleadingly suggest that such techniques had been employed as regards him.   The

19  Government points out, however, that the statement itself is true – toll data for TT-6 was

20  obtained from other pen registers and some from subpoenaed toll data.  And the statement does

21  not say that a pen register had been sought or granted regarding Zavala-Zazueta's phone.

22         The Government argues that a pen register (which captures the numbers called from a

23  particular phone) would not have been material, since the carrier for TT-6 was providing toll

24  records under a subpoena – but this information is not in the affidavit.  Since the issuing judge

1  could not have known it, the Court does not find it relevant to this motion.  Although the Court is

2  only concerned in this <u>Franks</u> motion with whether the statements were false or misleading

3  (which it finds they were not), the affiant does explain why pen register or trap and trace

4  warrants were not sought for Zavala-Zazueta: basically, that the information obtainable from a

5  list of phone numbers was of limited to no value, given the tendency of drug traffickers to

6  change phones frequently and to use false names to obtain them.  (Affidavit, ¶¶ 152-53.)

7      2.  <u>Confidential informants/Undercover agents</u>

8      The affidavit also stated "Based on my training, experience, knowledge of this investigation,

9  I believe that it is unlikely that confidential sources will be able to move up within the

10  organization…" (Affidavit, ¶ 61.)  The motion complains that in fact there was no attempted use

11  of confidential informants (CI's) during the investigation into Zavala-Zazueta.  But the analysis

12  for <u>Franks</u> purposes looks to whether the statement was false or misleading, and the Court finds

13  it to be neither.  The defense presented no evidence that the CI's within the DTO were highly

14  placed or had high-level (i.e., strategy, planning, overall organization) access to the operation.

15      Additionally, it is clear from the March 3 phone conversation that Defendant was

16  reconnecting with Eduardo after a prolonged period of no contact.  It defies common sense to

17  expect that low-level CI's would be given information about or access to a source of supply who

18  had just reconnected with the drug trafficking ring.  Similarly, it defies common sense to believe

19  that the authorities could place a CI in contact with a drug supply source for whom they had no

20  personal identification information in the two-plus months between the March 3 phone call and

21  the issuance of the wiretap warrant.  The Court finds that this statement neither false nor

22  misleading under the <u>Franks</u> criteria.

23      The defense also asserts that the affiant's statement that "I believe the introduction of a UC

24  [undercover agent] to members of the upper ranks of the organization would not be fruitful" (Ex.

9, Ex. C., ¶ 62) "can only be true if undercover agents were actually used in the investigation of Mr. Zavala-Zazueta." (<u>Franks</u> Mtn. at 8.)  Additionally, Defendant asserts that the affidavit omits the fact that there was an undercover detective introduced to the "highest level of the Asevez-Santillano DTO" (brothers Ediberto and Jesus). (<u>Id.</u>)  The same counterargument applies here – there were no undercover agents with access to Zavala-Zazueta, who was unknown up to the time the wiretap warrant was issued  – and while the Court finds the affidavit could have been more explicit in this regard, the omission does not rise to the level of a <u>Franks</u> issue.

   3.   <u>Video surveillance/pole camera</u>

   The investigators contemplated establishing video surveillance of Zavala-Zazueta's residence, but rejected the idea on the grounds that they had "been unable to find a suitable location for remote video surveillance at that location." (Ex. 9, Ex. C., 66.)  Defendant complains that the specific circumstances rendering the video surveillance unfeasible were not spelled out, and points out that video surveillance was established at one of Zavala-Zazueta's residences after the wiretap was approved.  The Court finds nothing inaccurate, misleading or false about this representation (and Defendant presents no evidence to the contrary), and the lack of specific details does not impact the accuracy of the statement.

   Defendant  presented evidence by means of a Federal Public Defender investigator of a light pole and a carport which presented possible locations for the placement of a surveillance camera. In the Court's view, neither location was suitable for surveillance of a suspect.  The light pole was at the rear of Defendant's apartment building and unlikely to provide useful information on his comings and goings; the carport was on private property (raising potential trespass issues) and would have necessitated that the camera be placed in a relatively low, easier-to-spot position. Defendant's evidence did not effectively rebut the necessity of the wiretap.

Nor does the fact that the police were later able to establish video surveillance on a <u>different</u> residence (according to the Government, not even Defendant's residence, just one of his co-conspirators) strike the Court as material.

4. <u>Physical surveillance</u>

Defendant characterizes as a misstatement the representation in the affidavit that:

> [T]he target subjects were identified with information gathered from intercepted calls.  If it were not for the intercepted calls, investigators would have likely not conducted physical surveillance of these subjects.

(Ex. 9, Ex. C., 74.)   Defendant argues that, since physical surveillance was utilized for over a year prior the issuance of the first wiretaps, this is a misstatement implying that only a wiretap could lead to successful physical surveillance.  The Court does not read this statement as stating or implying that the Zavala-Zazueta wiretap was necessary because physical surveillance had "failed."  The simple fact is that Zavala-Zazueta was not identified through physical surveillance, but through information that was obtained when Eduardo called him (which is all the affidavit says).  Defendant has not satisfied the <u>Franks</u> criteria as regards this aspect of the investigation.

5. <u>Financial investigation</u>

Defendant alleges that the representations in the affidavit regarding financial investigation were copy-pasted from previous applications and mistakenly create the impression that the financial investigation into Zavala-Zazueta had been a failure (thus a wiretap was required).

> Investigators have checked publicly available databases to determine those associated with the business and have searched… for evidence of possible money laundering by the business or those associated with the business.  At this point, investigators have not yet uncovered any evidence of money laundering tied directly to the business.

(Ex. 9, Ex. C., 84.)  In fact, Defendant argues that the police were "well aware of the various businesses other targets were using to send money abroad.  They were also aware that a Wells Fargo bank was utilized by Jesus and Sendhy Aceves-Santillano."  (<u>Franks</u> Mtn, 12.)  Defendant

1   complains that the affidavit fails to mention, not only those facts, but the fact that Zavala-

2   Zazueta was not associated with those targets or those businesses at the time any money-

3   laundering was taking place.  (Id.)  Defendant does not contest the truth of what is in the

4   affidavit, but claims the omissions are misleading.  In his affidavit, however, the affiant explains

5   that tracing the amount, source and distribution of money is useful for building a money

6   laundering case, but the information in and of itself does not establish the existence or the proof

7   of a DTO (i.e., the purchase and sale of drugs).  Additionally, for purposes of this motion the

8   Court finds it relevant that the investigators already had reason to believe that Defendant was a

9   drug supplier of the DTO, therefore they had no need to know about the whereabouts or

10  quantities of his money.  For purposes of this investigation, what was needed were details about

11  when and where he was supplying drugs to the DTO.  A financial investigation was never going

12  to supply that information.

13      6.  Establishing Zavala-Zazueta's identity

14  The affidavit represented that

15          Investigators have not fully identified UM4723.  Investigators have photographed
            UM4723 and have determined where he resides.  Normal investigative techniques
16          discussed in the section regarding Necessity have been used to attempt to identify
            UM4723 without success.

17

18  (Ex. 9, ¶ 25.)  Defendant presents evidence that, on May 8, 2015, the police had identified a car

19  registered to Zavala-Zazueta's and then identified Zavala-Zazueta as UM4723 based on his

20  driver's license photograph.  (Def. Ex. 17.)  At oral argument, there was a lengthy examination

21  and cross-examination of the affiant and his co-lead in the investigation (Officer Chan), intended

22  to establish whether the affiant was being truthful when he represented that UM4723's identity

23  was not known at the time of the wiretap application.

24

1    The Court will cut the Gordian knot on this issue by finding that (1) the affiant was, at

2    worst, mistaken when he represented that UM4723's identity was unknown and (2) in terms of

3    "necessity" (i.e., had the issuing judge known that in fact UM4723's identity <u>was</u> known) this

4    fact is simply not important.  The Court, having reviewed its share of wiretap warrants, takes

5    judicial notice of the fact that many wiretaps are authorized even though the identity of the

6    subject of the wiretap is already known.  It is not a factor which, one way or the other, is

7    determinative of the necessity of a wiretap.

8    The defense also raises the argument in their reply on this motion that, had the issuing

9    judge seen the full text of the conversations of March 3 and March 7, he would have seen that

10   there was not sufficient evidence to suggest that Zavala-Zazueta was involved in the drug trade

11   with the other Defendant's.  While this issue does play into the question of necessity, it will be

12   discussed more fully in the "probable cause" portion of the analysis of the motion to suppress.

13   Suffice it to say at this point that the Court disagrees with Defendant: in either their summary or

14   complete transcript forms, the conversations are unquestionably drug-related and suggestive of

15   Defendant's involvement (both retrospectively and prospectively) with the DTO.

16   Because the issue of "necessity," whether the investigators had fully explored alternate

17   means of developing the information they sought to procure against the Defendants, overlaps

18   both the <u>Franks</u> motion and the motion to suppress, it will be analyzed in depth in this section.

19   For purposes of this order, the analysis is applicable to both portions of this ruling.

20   The <u>Franks</u> standard calls for the Court to determine if there were inaccuracies in the

21   affidavit and to determine, based on credible evidence produced at the suppression hearing,

22   whether there was a necessity for the wiretap warrant to issue.  <u>U.S. v. Carneiro</u>, 861 F.2d 1171,

23   1176 (9th Cir. 1988).  If the Court determines that "a reasonable district court judge could have

24

1   denied the application because necessity for the wiretap order had not been shown…" then the

2   wiretap must be suppressed.  U.S. v. Ippolito, 774 F.2d at 1487.

3       A district court must reject a wiretap application if law enforcement officers have not first

4   attempted, without success, traditional investigative methods that "easily suggest themselves and

5   are potentially productive and not unduly dangerous." [*citation omitted*]. Taken together,

6   §§ 2518(1)(c) and (3)(c) require a showing of necessity before a district court can issue a wiretap

7   order. Id. at 1485. "The purpose of the necessity requirement is to ensure that wiretapping is not

8   resorted to in situations where traditional investigative techniques would suffice to expose the

9   crime. [*citation omitted*]."   United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir. 1988).

10      In analyzing the issue of necessity, the Court is mindful that "[w]hile the wiretap should

11  not ordinarily be the initial step in the investigation… law enforcement officials need not exhaust

12  every conceivable alternative before obtaining a wiretap." U.S. v. McGuire, 307 F.3d 1192,

13  1196-97 (9th Cir. 2002); *see also* U.S. v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000).  The

14  McGuire court also found that law enforcement is permitted a wider latitude and "more leeway"

15  in investigative methods when looking into large-scale criminal enterprises. McGuire, 307 F.3d

16  at 1197-98.

17      The Court finds that, in those instances where elements of less-intrusive investigative

18  techniques were either not employed regarding this Defendant, or were employed and then

19  abandoned, the affidavit contains an adequate explanation of why this was so, such that a district

20  court judge could reasonably conclude that a wiretap of Defendant's phone was necessary.

21      Regarding pen registers and trap and traces, the affiant made this explanation:

22      Based on my training and experience, I know that drug traffickers often use prepaid
        cellular phones, change phones often, and list false name and addresses for subscriber

23      information… [T]his activity with respect to cellular telephones makes it difficult to
        identify what member is using which cellular telephone number.

24

1

2
> Although the pen registers and telephone records have provided useful information during this investigation, these records do not identify the individuals actually using the telephones, and cannot detail the substance of the conversations.

3

4
Ex. 9, Ex. C, ¶¶ 152-53.

5
      Regarding vehicle tracking devices, the affiant explains how they are useful for tracking

6
movement, but not for providing information about what happens when the subjects finally get to

7
their destination, or who the people are with whom they are meeting.  Something mentioned in

8
the affidavit but not stressed in the briefing is the inherent shortcoming of the technology based

9
on "the need to change batteries, which can be dangerous to the agents and the investigation."

10
Id. at ¶¶ 199-200.

11
      GPS cell trackers and physical surveillance present similar problems in that, while the

12
investigators may know where the subjects are, "[w]ithout knowing why the subjects are

13
meeting, the contents of their conversations, or why they enter or exit certain locations, physical

14
surveillance even with the assistance of GPS data, is of limited use."  Id. at ¶ 209.  Furthermore,

15
"drug traffickers typically act in a manner that is intended to disguise or conceal the illegal

16
nature of their conduct," further limiting the utility of just knowing where the subjects are and

17
following them there.  Id. at ¶ 212.

18
      With respect to the Franks criteria, the Court finds that the affidavit contained neither

19
knowing and intentional false statements nor statements made with a reckless disregard for the

20
truth.  Furthermore, the warrant application contained adequate information regarding the results

21
of having utilized less-intrusive forms of investigation, the limits of those less-intrusive forms,

22
and why it was necessary to carry the investigation beyond those methods to obtain the

23
information only available by wiretap.  Defendant has not met his burden of making a substantial

24
showing of the Franks factors and his motion in that regard will be DENIED.

**Motion to suppress evidence**

The Title III wiretap requirements are concerned with three factors: probable cause, necessity and minimization.  Neither side argues the "minimization" factor (Defendant conceded at oral argument that "minimization" was not being contested), so it will not be discussed here.

Probable cause

Probable cause is defined in the statute as, among other things, "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter [and] (b) … probable cause for belief that particular communications concerning that offense will be obtained through such interception…" (18 U.S.C. § 2518(3)).

Probable cause is established if the "'totality of the circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance." U.S. v. Ambrosio, 898 F.Supp. 177, 181 (S.D.N.Y. 1995).   Defendant argues that the allegations of probable cause contained in the warrant request consist only of "probable cause by association" based on (1) his communications with Eduardo and (2) Defendant being seen driving Sendhy around.

The Court does find, on the one hand, that there is a patchwork of circumstantial evidence that the Government tries (and fails) to weave into a web of probable cause.  Following the series of three phones calls on March 3, 7 and 8, the affidavit reports an unsuccessful number of attempts to meet, and then an agreement (by text) to meet on March 14. The affidavit then states

> Afterwards, intercepted calls over TT-5 indicated that Eduardo Guzman-Valenzuela
> began to immediately distribute *the drugs obtained from UM4723.*

1   Ex. 9, Ex. C, ¶ 30 (emphasis supplied).  The Court finds this to be an unacceptable leap of logic,

2   and notes that no evidence was presented at the hearing on these motions that lent any further

3   credence to this assumption.

4       Similarly, the surveillance of Defendant driving Sendhy around revealed nothing

5   inherently productive of probable cause to suspect criminal activity – Sendhy did not take

6   anything into Defendant's car, nor bring anything out of Defendant's car; she was observed

7   making a delivery to Jesus only after she had transferred to Veronica's car.  There is a series of

8   14 texts between Defendant and Sendhy on that same day, but the content of them was not

9   captured and it is nothing but sheer speculation to label them indicative of drug activity.

10       These items of evidence do not help the Government establish the probable cause

11   necessary to justify a warrant.  However, the Court does find that, independent of any other

12   evidence produced by the prosecution, Defendant's phone conversations with Eduardo establish

13   the requisite probable cause.  In addition to the two calls on March 3 and 7 (the transcripts of

14   which are reproduced in the Franks section *supra*), there was a third call on March 8.  The only

15   evidence of that call in the affidavit is the following "synopsis":

16

17

18

19

20

21

22

23

24

1 | EDUARDO to UM4723
UM4723 told EDUARDO that his friend [UM] had not reached out to him [UM4723] and that he [UM]
2 | suppose to come today. UM4723 continued that his friend [UM] told him [UM4723] that he was coming
yesterday, or today. EDUARDO acknowledged. UM4723 told EDUARDO that he had people waiting and
he [UM4723] only had half of it [product]. EDUARDO told UM4723 that he actually needed "one good one"
3 | for now.
UM4723 told EDUARDO that he told UM that he [UM4723] is not playing around, that he [UM] needed a
4 | better communication with him [UM4723]. UM4723 told EDUARDO that that was the reason he [UM4723]
had not contacted him [EDUARDO] because he did not had any updates.
UM4723 told EDUARDO that when he [UM4723] was ready, he'd give him [EDUARDO] a call.
5 | EDUAROD asked UM4723 when would he know for sure, UM4723 replied next week would be best.
UM4723 continued that he [UM] had some product here that he [UM] wanted UM4723 to distribute, but he
6 | [UM] is not cooperating. UM4723 told EDUARDO that hopefully tomorrow [Monday] or Tuesday because
his [UM4723] brother [UM2] is also coming. UM4723 said that his brother [UM2] is learning all movements
now. EDUARDO acknowledged.
7 | UM4723 told EDUARDO that he'd let him know, and EDUARDO said to contact him ASAP when he
knows any updates.
8 | EOC
dplascencia
UM4723 told EDUARDO that he would pay him until next week.

9

10 | Ex. 10, p. 11.

11 |       Knowing what the authorities knew about Eduardo at the point in the investigation that

12 | these phone conversations occurred, it is impossible to review the contents of these conversations

13 | and not conclude that drug business is being transacted, or least being planned.  When someone

14 | says to a known drug dealer "I am the one who used to take care of you before," "I am here for

15 | anything you need and "[T]hat's why I went to your brother.  To check what's the deal, what can

16 | we do, to see if we can work" (Ex. 10, p. 3), the probability that a discussion concerning the drug

17 | trade is occurring is high.  When that same person says to the same drug dealer, "No, man, we

18 | are going to do that movement tomorrow," "Tomorrow for sure.   For the, for the [U/I].  For the

19 | chocolates you want" (Ex. 10, p. 7), the chances that this is not a conversation about candy are

20 | equally high.

21 |       The affiant testified at the hearing that, in his experience, drugs are often referred to by

22 | code names related to the color of the drug (in the case of heroin, "black paint" or "chocolate").

23 | What is apparent from these conversations is that the participants were attempting to disguise the

24

1    fact that they were talking about drugs and drug sales, and not doing a very good job of it.  It was

2    entirely reasonable for the issuing judge to find probable cause to suspect that a crime was being

3    planned based on these conversations.

4          Defendant claims that this is "probable cause by association;" the Court disagrees.

5    Knowing that the person on one end of a telephone call is a drug dealer and concluding, based on

6    that knowledge and the content of the conversation, that the person on the other end is engaging

7    in drug-related business with him is not "transfer of probable cause," it is just basic deductive

8    reasoning.

9          Defendant argues that "[i]t defies common sense to listen to this conversation on March

10   3, 2015 and suggest to the issuing judge that Mr. Zavala-Zazueta was or is a source of supply for

11   the Asevez-Santillano DTO."  (Reply at 6.)  The Court finds just the opposite: it defies common

12   sense to review the contents of that conversation (in either the summary or *verbatim* formats) and

13   conclude that anything other than a drug transaction is being discussed.  That conclusion is only

14   bolstered by the two conversations which followed.   The element of probable cause was

15   sufficiently established by the information contained in the application for the wiretap warrant.

16   <u>Necessity</u>

17         The Court's analysis of this factor is guided by the Ninth Circuit precedent that "'the

18   government ha[s] no duty to establish [necessity] as to each possible interceptee.  It is sufficient

19   that…' the Government sufficiently established necessity for the wiretap with regard to its

20   investigation of the drug trafficking conspiracy as a whole."  <u>U.S. v. Reed</u>, 575 F.3d 900, 911

21   (9th Cir.  2009) (*quoting* <u>U.S. v. Nunez</u>, 877 F.2d at 1473 n.1).  The impact of that holding on this

22   case will be discussed in greater depth at the end of this section.

23

24

1   As mentioned above, there is considerable overlap between the "necessity" analysis as

2   regards the Franks motion and the motion to suppress.  The "necessity" analysis *supra* applies

3   equally to the motion to suppress and will not be repeated here.  However, Defendant attacks

4   other aspects of the "necessity" rationale as presented in the affidavit, and the Court analyzes

5   those arguments below.

6   Defendant attacks the Government's reasons for not using either CI's or undercover

7   agents to contact Defendant, but the Court remains unpersuaded that this was a viable alternative

8   means of investigation.  The Government argues convincingly that neither CI's nor their

9   undercover agents would have been useful in investigating Zavala-Zazueta.  None of their CI's

10  knew Zavala-Zazueta and their undercover agents were not placed anywhere near the top of the

11  pyramid of the DTO; they were acting as lower-level drug purchasers (Defendant makes much of

12  their "introduction" to high-level participants like Jesus and Ediberto, but having contact is not

13  the same thing as having trust or being privy to the inner workings of the organization).  It is

14  clear from the March 3 phone conversation that Defendant had not been in contact with the DTO

15  for some period of time, which meant (1) none of the investigation's current CI's or UC's would

16  necessarily have had any contact with him and (2) an investigation that was already over two

17  years old would have had to wait an additional (likely lengthy) period of time while new contacts

18  with a (at this time, unknown) suspect were attempted.  The necessity requirement does not

19  extend this far.

20  The affidavit indicates that a mail cover (a court-ordered arrangement whereby the USPS

21  records the names and addresses of letters and packages being delivered to a certain person or

22  address) had been applied for but not yet approved at the time of the wiretap application.  In fact,

23  testimony at the hearing revealed that the mail cover had been approved by the time of the

24

1  application and the results of the mail cover had become available, an omission which the

2  Government conceded was in error.   The Court notes that it was the Government which brought

3  this error to the attention of the defense, and finds that, while this was a fact which clearly should

4  have been included in the affidavit, its omission does not rise to the level of knowing and

5  intentional false or reckless disregard for the truth.

6       Furthermore, the Court finds the affiant's explanation of the relative lack of utility (that,

7  while mail covers are useful for developing leads, they are of limited to no utility in disclosing

8  how DTOs obtain and distribute their drugs or the proceeds of their drug transactions; Ex. 9, Ex.

9  C, ¶¶ 221, 224) satisfactory.  Even had the investigators had the advantage of the mail cover

10  evidence before them and provided that evidence to the issuing judge, it would not have

11  impacted the necessity of issuing the wiretap warrant.

12       Defendant's argument regarding trash searches fares no better.  While the parties go back

13  and forth about whether or not it was actually possible to do trash searches of Defendant's refuse

14  without being detected, in the final analysis the affiant's explanation that experienced drug

15  traffickers rarely if ever throw items into the trash that reveal anything significant about the

16  organization or how it operates (Ex. 9, Ex. C, ¶¶ 218, 220) is sufficient in the Court's eyes to

17  dispose of this argument.

18       Finally, regarding financial investigations: the affidavit provided considerable detail on

19  the financial investigations that had been conducted up to that point and what the investigators

20  had discovered from those techniques. The Court is struck by the point which the affiant makes

21  in regards to the necessity of the wiretap; namely, that a financial investigation "rarely

22  establishes the necessary predicate criminal offenses which must be shown in order to pursue

23  money laundering charges and asset forfeiture." (Ex. 9, Ex C, ¶ 246.)  In other words, a financial

24

1  investigation may be useful initially in confirming that illegal activity is occurring, but it will not

2  in and of itself yield the results which were the goal of this investigation; namely, the

3  identification, prosecution and dismantling of a vast network of drug suppliers and distributors.

4      Which brings the Court back again to the current Ninth Circuit legal standard regarding

5  necessity as announced by the court in Reed:

6      [T]he necessity requirement is directed to the objective of the investigation as a whole
       and not to any particular person.  If the Government can demonstrate that ordinary
7      investigative techniques would not disclose information covering the scope of the drug
       trafficking enterprise under investigation then it has established necessity for the wiretap.

8  U.S. v. Reed, 575 F.3d at 911.  The scope of the investigation is defined by its objectives, which

9  are laid out in the affidavit:

10     The objectives of this investigation are to identify and develop admissible evidence
       sufficient to successfully prosecute the leaders and members of the Ediberto Asevez-
11     Santillano DTO, operating in the Western District of Washington and elsewhere,
       including its sources of supply, and to dismantle the DTO such that it is no longer able to
12     operate.

13 (Ex. 9, Ex C, ¶ 18.)  In the affidavit, the affiant returns again and again to the observation that the

14 investigation (which was 2.5 years old at the time of this request) had reached the point where

15 the alternative techniques of information gathering, which had been utilized extensively, would

16 no longer suffice to achieve the goals of the investigation: to uncover and dismantle a

17 widespread, multi-person DTO.  (See, e.g., Ex. 9, Ex C, ¶¶ 153, 202, 209, 212.)

18     Defendant makes much of the language in U.S. v. Carneiro, wherein the Ninth Circuit

19 stated:

20     The government's earlier investigations of [various co-defendants] are irrelevant to the
       question of whether the government adequately investigated [Defendant] to identify his
21     cocaine source and the scope of his drug operation before resorting to electronic
       surveillance to acquire that information.  As the government recognizes in its brief, "there
22     must be a showing of necessity with respect to each telephone and conspirator."

23

24

1   Id.at 1181-82 (citations omitted)(emphasis in original).  At first glance, this seems incompatible

2   with the language of Reed regarding analyzing necessity in the context of the "scope of the drug

3   trafficking enterprise under investigation."

4        But Carneiro is distinguishable on its facts – the Ninth Circuit clearly states in that case

5   that "the government failed to investigate Boyd before seeking a wiretap on his telephone."  (Id.

6   at 1182.)  The affidavit for the Boyd wiretap claimed that an investigation of Boyd's associates

7   and his telephone records had been made, neither of which was true.  Additionally, the affidavit

8   stated that surveillance of Boyd was impractical when in fact it had never been attempted (and

9   was successfully performed after the wiretap was granted).   The affiant's statement that the

10  investigation "through surveillance and other investigative methods, has failed to reveal any

11  direct link between Thomas J. Boyd and persons supplying him with cocaine" was found to be

12  simply copied from prior wiretap applications; no investigation of Boyd had been conducted.

13  Id.  This is simply not the case in the application before the Court and the Court considers the

14  holding of Carneiro, to the extent it conflicts with the broader rule announced in Reed, to be

15  confined to its facts.

16       In the wiretap application before the Court in this motion, the Government has

17  successfully demonstrated "that ordinary investigative techniques would not disclose information

18  covering the scope of the drug trafficking enterprise under investigation," and thus the

19  requirement of necessity was sufficiently established.  Having also found that probable cause

20  existed for the issuance of the warrant, the Court finds that Judge Robart did not abuse his

21  discretion in authorizing the wiretap, and DENIES the motion to suppress.

22

23

24

Good faith exception

The Government makes the additional argument that, even if it were found that Judge Robart abused his discretion in approving the wiretaps, the agents (acting in reasonable reliance on the wiretap order) fall under the "good faith" exception to the exclusionary rule. (*See* <u>U.S. v. Leon</u>, 468 U.S. 897 (1984).)  Having found that Judge Robart did not abuse his discretion, the Court declines to reach this issue.

## **Conclusion**

Based on the Court's finding that Defendant has failed to make a substantial showing that the affidavit supporting this warrant request contained false statements which were either deliberately false or the result of a reckless disregard for the truth, the <u>Franks</u> motion is DENIED.

Based on the Court's finding that an adequate showing of necessity was made, and that the facts did establish probable cause, it was not an abuse of discretion for Judge Robart to issue the wiretap authorization for Defendant Zavala-Zazueta's telephone, and the motion to suppress the evidence of that wiretap is DENIED.

The clerk is ordered to provide copies of this order to all counsel.

Dated February 12, 2016.

Marsha J. Pechman
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24